# EXHIBIT 1



Perkins
Coie
Brown
& Bain

Craig A. Morgan
PHONE: (602) 351-8149
FAX:   (602) 648-7170
EMAIL: CMorgan@perkinscoie.com

2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
PHONE: 602.351.8000
FAX: 602.648.7000
www.perkinscoie.com

January 20, 2009

**VIA HAND DELIVERY**

Maricopa County Sheriff's Office
100 West Washington
Suite 1900
Phoenix, AZ 85003

Arizona Department of Corrections
Central Office
1601 West Jefferson
Phoenix, AZ 85007

Maricopa County Board of Supervisors
Clerk of the Board of Supervisors
301 West Jefferson
10th Floor
Phoenix, AZ 85003

Attorney General Terry Goddard
Office of the Attorney General
1275 West Washington Street
Phoenix, AZ 85007

Maricopa County Correctional Health Services
234 North Central Ave
5th Floor
Phoenix, Arizona 85004

Re:     Notice of Claim Pursuant to A.R.S. § 12-821.01 on Behalf of
        James A. Payne

Dear Madame or Sir:

This firm represents James Payne, an individual once incarcerated under the care and supervision of the Maricopa County Sheriff's Office (the "MCSO"), Maricopa County Correctional Health Services ("CHS," referred to herein, together with MCSO, as "Maricopa") and the Arizona Department of Corrections (the "ADOC") between 2001 and 2007. This letter shall serve as notice, pursuant to A.R.S. 12-821.01, of Mr. Payne's claims against Maricopa and ADOC based on the facts and circumstances described herein.

Mr. Payne was diagnosed with diabetes in 1983. Mr. Payne successfully managed and controlled his disease until approximately April, 2001, when he was incarcerated and placed under the supervision of Maricopa, and later ADOC. While under their care, Mr. Payne did not

ANCHORAGE · BEIJING · BELLEVUE · BOISE · CHICAGO · DENVER · LOS ANGELES · MENLO PARK
OLYMPIA · PHOENIX · PORTLAND · SAN FRANCISCO · SEATTLE · SHANGHAI · WASHINGTON, D.C.

Perkins Coie LLP and Affiliates (Perkins Coie Brown & Bain P.A. in Arizona)

NOTICE OF CLAIM PURSUANT TO A.R.S. § 12-821.01
Maricopa County Sheriff's Office
Maricopa County Correctional Health Services
Arizona Department of Corrections
January 20, 2009
Page 2

receive the basic, constitutionally adequate medical care necessary for him to manage his disease. As a result of this negligence, Mr. Payne's disease overwhelmed his body, leaving him a totally and permanently disabled and unemployable brittle diabetic and shaving years from his life.

Today, Mr. Payne is a shadow of his former self. The ex-soldier, software engineer, and little league baseball coach endures a significantly diminished quality of life and a litany of complications associated with being a brittle diabetic. In addition to having been diagnosed as totally and permanently disabled and unemployable due to the substandard care he received while under Maricopa's and ADOC's care and supervision, Mr. Payne is in constant physical pain and he has lost cognitive function. Further, Mr. Payne suffers from an array of mental and physical ailments, including without limitation, neuropathy, anxiety, hypertension, and sexual dysfunction. Every day Mr. Payne must live with the reality that much of his current condition is irreversible and eventually he will likely die as a result. According to his treating physicians and a nationally prominent medical expert on diabetes, Mr. Payne's current condition resulted from the inadequate medical care and supervision of Maricopa and ADOC.

What follows is an overview of: (i) Mr. Payne's life before his incarceration, (ii) Mr. Payne's tenure with Maricopa and ADOC and their negligent actions and inactions causing Mr. Payne's present condition; (iii) a summary of Mr. Payne's current condition as well as a prognosis of what he can expect to endure in the future; and (iv) a proposed resolution of this matter.

I.      **Before His Incarceration, Mr. Payne Successfully Managed His Diabetes**

Until approximately 2001, through proper diet, exercise, and medical management, Mr. Payne controlled his disease. This all changed after a short period of turmoil in his personal life resulted in Mr. Payne's arrest and incarceration.

In 2001, Mr. Payne and his ex-wife, with whom he now resides, were having trouble in their marital relationship. To cope with this emotional time in his life, Mr. Payne turned to drugs. To finance his drug use, Mr. Payne manufactured replica identification cards and negotiable instruments using personal electronic equipment. Mr. Payne was eventually arrested for possession of a forgery device, incarcerated, and placed under the care of Maricopa (and, after the occurrence of certain events described below, his probation was revoked and he was placed under the care of ADOC). According to his current treating physician, Mr. Payne's drug use at this time did not contribute to his current condition, the true extent of which Mr. Payne first realized in 2008, after his release from incarceration and his consultation with and examination by competent medical professionals. Rather, "the mismanagement of Mr. Payne's diabetes

NOTICE OF CLAIM PURSUANT TO A.R.S. § 12-821.01
Maricopa County Sheriff's Office
Maricopa County Correctional Health Services
Arizona Department of Corrections
January 20, 2009
Page 3

*during his incarceration in Arizona* resulted in medically significant long-term physical and emotional damage" (as will be discussed in detail below). Letter from Dr. Daniel L. Lorber, M.D., F.A.C.P. dated January 7, 2009 (the "Lorber Letter"), at 3 (emphasis added).

Mr. Payne, currently 44 years old, was first diagnosed with Type 1 diabetes in 1983 while serving in the United States military and he was honorably discharged that same year. Mr. Payne sought treatment for his disease through the United States Department of Veterans Affairs and, in 1983, began managing and controlling his diabetes.

In approximately 1990, a Georgia endocrinologist taught Mr. Payne how to count carbohydrates, manage his diet, and further control his disease. A year later, Mr. Payne began to use an insulin pump. Controlling diabetes through carbohydrate-counting and insulin pump use, though novel at the time, have since evolved into the standard of care for diabetes management and enabled Mr. Payne to maintain a blood sugar level between 100 and 150, an amazing level of blood sugar management by any account.

For years after receiving his diagnosis, Mr. Payne led a life relatively free from diabetic complications and his contributions to his community were many. For example, with his family, Mr. Payne successfully ran a software company where he developed software used by many large companies across the United States. Eventually, Mr. Payne relocated to Arizona, where he took a position with United Parcel Service. Here, too, Mr. Payne excelled at his job, quickly earning the respect of his superiors and admiration of his peers. In addition, Mr. Payne was a devoted father. When he was not working, "Coach" Payne was on the baseball diamond, passing his love for the game on to his (and other) children by coaching Little League baseball. Now, due to his current mental and physical condition as a result of Maricopa's and ADOC's failure to properly care for Mr. Payne and adequately treat his disease while under their supervision, *his* quality of life has been severely and irreversibly diminished.

## II.    Mr. Payne's Incarceration History

In approximately April, 2001, Mr. Payne was arrested and placed under Maricopa's supervision at the Durango Jail ("Durango"). Shortly after his arrival at Durango, Maricopa transferred Mr. Payne to the Madison Street Jail ("Madison"). Mr. Payne remained in Madison until July 10, 2001, after he pleaded guilty to a class 6, open ended felony and was sentenced to 2 years probation.

Shortly after his release from Madison, Mr. Payne's father passed away in Georgia. Against his probation officer's instruction, Mr. Payne attended his father's funeral in Georgia. When Mr.

NOTICE OF CLAIM PURSUANT TO A.R.S. § 12-821.01
Maricopa County Sheriff's Office
Maricopa County Correctional Health Services
Arizona Department of Corrections
January 20, 2009
Page 4

Payne returned to Phoenix he did not report to his probation officer for fear that he would be punished for attending his father's funeral. Eventually, in September, 2001, Mr. Payne was arrested and returned to Madison where he remained until approximately April, 2002, when he was sentenced to prison as a result of his probation violation (the "First Sentence"). Shortly after that sentencing, Mr. Payne was transferred to the ADOC facility in Florence, Arizona, where he remained until approximately September, 2002.

In approximately September, 2002, after serving the First Sentence, Mr. Payne was transferred back to Madison (on a detainer) due to (i) charges lodged against him while incarcerated and serving the First Sentence[1], and (ii) on a new charge related to the facts and circumstances surrounding the incident that resulted in the First Sentence.[2] Mr. Payne was released on bond approximately thirty days after his arrival at Madison in September, 2002.[3]

In approximately September, 2003, Mr. Payne was given a second sentence (the "Second Sentence") with regard to the new charge related to the facts and circumstances surrounding the incident that resulted in the First Sentence and eventually returned to the ADOC facility in Florence, Arizona. Mr. Payne remained at ADOC's Florence facility until his release from custody in approximately September, 2007.

Mr. Payne now resides in Chino Valley, Arizona, with his ex-wife and children.

### A.   Mr. Payne's Pre-trial Custody With Maricopa

#### (i)   Mr. Payne Did Not Receive Proper Medical Treatment While in Maricopa's Custody

It is no secret that the medical care that Maricopa provides pretrial detainees is constitutionally deficient. Recently, the United States District Court for the District of Arizona found that despite the fact that "[d]uring intake screening, health personnel are instructed to check for a history of . . . diabetic care . . . the intake screening often does not capture basic and necessary information from detainees, including an adequate history from those suffering from chronic diseases." *See Graves v. Arpiao et al.*, CV-77-0479-PHX-NVW at ¶¶ 163-64 (D. Ariz. Oct. 22, 2008) (Findings of Fact and Conclusion of Law). In fact, "incoming pretrial detainees with

---

[1] This incarceration-related charge was eventually dismissed.

[2] This arrest was related to allegations of attempting to cash fictitious checks at the time the acts giving rise to the First Sentence occurred.

[3] Upon posting bond, Mr. Payne was able to again begin use of his insulin pump, obtain insulin from the VA and resume controlling his blood sugar levels through regular self-monitoring and testing (*e.g.*, "finger sticks").

NOTICE OF CLAIM PURSUANT TO A.R.S. § 12-821.01
Maricopa County Sheriff's Office
Maricopa County Correctional Health Services
Arizona Department of Corrections
January 20, 2009
Page 5

chronic medical problems, such as diabetes . . . often do not receive their medication in a timely manner" and "[s]ystematic deficiencies in the screening process significantly impair continuity of care and result in failure to identify pretrial detainees with immediate medical needs." *Id.* at ¶¶ 172, 177. Worse yet, "[p]retrial detainees frequently are denied access to adequate medical . . . care because they do not receive a timely in-person assessment of the urgency of their need for treatment." *Id.* at ¶ 193.

In addition, Maricopa "does not maintain a list of pretrial detainees with chronic diseases," such as a list of those who, like Mr. Payne, suffer from diabetes, and thus Maricopa "cannot readily determine where [those persons] are housed and what medications have been prescribed for them." *Id.* at ¶ 195.

Maricopa did not provide Mr. Payne the care and treatment necessary to allow him to manage his chronic disease. This was no doubt due to a number of factors, including the fact that "Detention officers do not know which pretrial detainees are receiving health care or have been prescribed medication," and thus lack the minimal information necessary to identify those inmates with a chronic disease—such as Mr. Payne—and react accordingly. *Id.* at ¶ 225. Maricopa's failure to properly care for Mr. Payne and adequately treat his diabetes continued throughout his tenure with Maricopa and, as Mr. Payne first discovered after consulting with medical professionals in late 2008, that mistreatment exacerbated his disease and caused him irreversible damage. For example, on one occasion in 2001, while in his cell, Mr. Payne exhibited profuse sweating and intense panicking—familiar symptoms of low blood sugar (a common side effect of diabetes). When Mr. Payne asked a deputy for medical assistance, the deputy refused to help. Eventually, when the deputy returned to Mr. Payne's cell (to retrieve his cellmate), Mr. Payne exited his cell in a sweat-drenched, diabetes-induced panic. Fearing the worst, Mr. Payne refused to go any longer without medical care and would not re-enter his cell until he received treatment for his disease. Mr. Payne's actions were not well received; he was refused medical treatment, beaten, placed into secure and solitary confinement, and forced to suffer through the first of many hypoglycemic and hyperglycemic episodes.[4]

---

[4] *ADOC recognizes hypoglycemia as "low blood sugar, insulin reaction or insulin shock" that "is caused when insulin intake is too great for amount of food eaten" and it "must be treated quickly . . . because, untreated, hypoglycemia can lead to unconsciousness." ADOC Health Services Bureau HEP 1007-01/06 (Maricopa appears not to have made a similar acknowledgement, but we assume that Maricopa will not contest these medically accepted facts). ADOC recognizes hyperglycemia as "high blood sugar" that "[o]ccurs when there is too little insulin for food eaten." Id. As will be explained below, ADOC rarely heeded its own cautionary statements in this regard. Moreover, "[S]igns and symptoms of hypo- or hyperglycemia can often be confused with intoxication or withdrawal from drugs or alcohol. Individuals with diabetes exhibiting signs and symptoms consistent with*

NOTICE OF CLAIM PURSUANT TO A.R.S. § 12-821.01
Maricopa County Sheriff's Office
Maricopa County Correctional Health Services
Arizona Department of Corrections
January 20, 2009
Page 6

Similarly, when Mr. Payne returned to Madison in September, 2001, indifference toward (or unjustified ignorance of) Mr. Payne's chronic medical condition continued. For instance, Mr. Payne was not allowed to monitor his blood sugar level with the minimum frequency necessary to manage his disease effectively.[5] *See Diabetes Management in Correctional Institutions,* Diabetes Care, Vol. 31, Supp. 1, Jan. 2008 ("Timing of meals and snacks must be coordinated with medication administration as needed to minimize the risk of hypoglycemia . . . ."). Likewise, Mr. Payne had difficulty obtaining food and insulin within the appropriate time frame so as to prevent the fluctuation of his blood sugar. And, when Mr. Payne was actually given food within a reasonable time after receiving insulin, the food was often moldy, rotten, riddled with insects, and, of great significance to a diabetic, contained a wide variant of carbohydrates, the effect of which was to alter Mr. Payne's blood sugar to unhealthy levels. *See* Progress Notes dated 01/28/04 at 1635 (noting Mr. Payne "brought down a bag of bread that had fruit flies and a roach and stated officers would not give him another sack and that's why his blood sugar would be low."); *Graves,* CV-77-0479-PHX-NVW at ¶¶ 398-99, 407 ("The fruit provided . . . often is overripe or bruised and frequently inedible," "[t]he bread provided . . . is frequently moldy and entirely or in part inedible," and Maricopa "cannot establish that pretrial detainees are served adequate nutrition."). In fact, proper nutrition is of paramount importance to persons with diabetes, like Mr. Payne, who must eat a carefully planned and formulated "diabetic" diet in order to maintain a healthy blood sugar level. *See Diabetes Management in Correctional Institutions,* Diabetes Care, Vol. 31, Supp. 1, Jan. 2008 ("It is essential that medication and medical nutritional therapy (MNT) be continued without interruption upon entry into the correctional system, as a hiatus in either medication or appropriate nutrition may lead to either severe hypo- or hyperglycemia that can rapidly progress to irreversible complications, even death."). At first, Mr. Payne was prescribed (but did not always receive) such a diet. Eventually, however, for no apparent reason, on or around October 17, 2003, Maricopa ordered that Mr. Payne's diabetic diet be *discontinued. See* Modified Diet Order dated 10/17/03. Mr. Payne now understands that these unconstitutional and negligent nutritional deficiencies only exacerbated his disease and contributed to his current condition.

---

hypoglycemia, particularly altered mental status, agitation, combativeness, and diaphoresis, should have finger-stick blood glucose levels measured immediately." *Diabetes Management in Correctional Institutions,* Diabetes Care, Vol. 31, Supp. 1, Jan. 2008 (a copy of which is enclosed herewith as Exhibit A).
[5]Mr. Payne's "fingerstick glucose values were characterized by wide swings between severe hypoglycemic levels causing . . . loss of consciousness and [glucose levels] *more than five times normal.*" Lorber Letter at 1 (emphasis added). At best Mr. Payne's ability to test his blood sugar was sporadic, and that was only if he argued with corrections staff, demanded the tests, and accepted the consequences of demanding medical treatment (e.g., increased hostility and physical abuse). This problem was pervasive with Maricopa, and as will be discussed below, also with ADOC.

NOTICE OF CLAIM PURSUANT TO A.R.S. § 12-821.01
Maricopa County Sheriff's Office
Maricopa County Correctional Health Services
Arizona Department of Corrections
January 20, 2009
Page 7

Worse yet, Mr. Payne's obvious diabetic symptoms—*e.g.*, lethargy and unconsciousness—often went ignored or were met with violence instead of medical treatment. This is particularly alarming because "[l]apses in medication for . . . diabetes . . . can be life threatening even if the lapse is only a few days." *Graves*, CV-77-0479-PHX-NVW at ¶ 232. For example, on one occasion in 2004, Mr. Payne complained that during a hypoglycemic episode an officer treated Mr. Payne's mumbling as nothing more than an exercise in defiance.[6] In response, that officer kicked Mr. Payne's cell door, told others "he's alright" and then walked away. Inmate Grievance Form dated 5/16/04, #5045. Finally, after the passage of considerable time, Mr. Payne was extracted from his cell and taken to the infirmary because he was unable to respond to officers. *Id.* The outrageousness of Maricopa's failure to care for Mr. Payne properly is only surpassed by its response: "Inmate pulled from his cell and spoke to. Resolution was inmate will be required to sit up and give a coherent response to prove he is not in distress." Inmate Grievance Form dated 5/16/04, #5045. On another occasion, in November, 2003, a nurse refused to provide Mr. Payne with his doctor's prescribed medicine because the nurse "did not have enough time." Inmate Grievance Form dated 11/02/03, #9966. Maricopa's resolution, surprisingly, was not to deny that the incident occurred. Maricopa acknowledged that it willfully refused to provide Mr. Payne with his medicine, resolving that "medical will work with detention to bring Mr. Payne to medical if nurse is unable to go up to the level." *Id.*

And, when Mr. Payne would receive some type of treatment, it was often the wrong type of treatment. This is no surprise, however, because "[i]n addition to inconsistencies in obtaining necessary prescription information during the intake process, [Maricopa] does not consistently ensure that all pretrial detainees actually receive all prescribed medications as ordered." *Id.* at ¶ 233. For example, Mr. Payne often would not receive the correct insulin dosage prescribed him. *See e.g.*, Progress Notes dated 06/26/04 at 0030 ("'they changed my insulin yesterday'"); Progress Notes dated 07/04/04 at 2340 ("'now they have cut down on my NPH again and adjusted my sliding scale so I don't get anything for less than 200 . . . 'I'm afraid to eat anything anymore.'").[7] Because Mr. Payne would often receive the incorrect dosage of insulin necessary to control and manage his disease, his blood sugar levels often would fluctuate between

---

[6] Mr. Payne's "mumbling" and apparent incoherence and lethargy are all textbook symptoms of severe hypoglycemia. *See Diabetes Management in Correctional Institutions*, Diabetes Care, Vol. 31, Supp. 1, Jan. 2008 ("Severe hypoglycemia is a medical emergency . . and is often associated with mental status changes that may include confusion, incoherence, combativeness, somnolence, lethargy, seizures, or coma. Signs and symptoms of severe hypoglycemia can be confused with intoxication or withdrawal.").

[7] On one occasion Mr. Payne mentioned to the nurse administering his insulin that she was giving him an incorrect dosage. And, although the supervising officer agreed with Mr. Payne's assessment, the officer did nothing when the nurse proceeded to inject Mr. Payne with the wrong dosage anyway. Mr. Payne rightfully objected to the nurse's carelessness, however, his objections were met with the usual litany of disciplinary retaliation.

NOTICE OF CLAIM PURSUANT TO A.R.S. § 12-821.01
Maricopa County Sheriff's Office
Maricopa County Correctional Health Services
Arizona Department of Corrections
January 20, 2009
Page 8

extremely unhealthy ranges as high as 600 and as low as 17.[8]  *See* Progress notes dated 10/02/03 at 2020 (blood sugars fluctuating from 422 to 498); 10/30/03 at 0730 ("nurse gave scheduled NPH but did not give regular, notified Gene Thompson, PA of the same."); Lorber Letter at 2 (Maricopa's records (which appear incomplete) "revealed repeated episodes of severe hypoglycemia and hyperglycemia.").

Maricopa's failure to provide Mr. Payne with even the most basic medical care caused him to endure a significant number of hypoglycemic and hyperglycemic episodes that, as Mr. Payne recently discovered, resulted in permanent physiological and psychological damage.[9]  *See* Progress Notes dated 06/02/04 at 0240; Progress Notes dated 06/03/04 at 0135 ("lethargic and very slow . . . thought processes - Accu chk **35**.") (emphasis in original); 06/24/04 at 1200 ("hypoglycemic episode, 35 b/s, found unconscious in cell"); Progress Notes dated 07/04/04 at 2340 ("Inmate brought down for late night accu ck – Accu ck **351**.") (emphasis in original); Progress Notes dated 07/05/04 at 2345 (Inmate brought to Medical for late night Accu ck – Accu ck **345**.") (emphasis in original).

### (ii)    Officers Punished Mr. Payne For Filing Grievances

Although Mr. Payne did not know the extent and cause of his current condition until after his release from incarceration and recent consultation with and treatment by competent medical professionals unaffiliated with Maricopa (and ADOC), Mr. Payne did attempt to improve his situation while under Maricopa's (and ADOC's) care. For example, after an incident in April, 2004, Mr. Payne filed a grievance regarding what he considered to be deficient and inadequate medical care he was receiving for his disease. *See* Inmate Grievance Form dated 4/16/04, #5009. The grievance concerned an occasion where, during a 4:30 a.m. "Accucheck," Mr. Payne was

---

[8] Unfortunately, this was not uncommon. Based on what records (albeit incomplete) Maricopa provided, it is conclusive that in November, 2003, alone Mr. Payne had blood sugar fluctuations ranging between 58 and 524. *See* Diabetic Control Flow Charts dated 11/12/03 at 1730 (blood sugar level of 304), 0715 (blood sugar level of 368); 11/07/03 at 0734 (blood sugar level of 341) and 1400 (blood sugar level of 428), 11/08/03 at 0730 (blood sugar level of 370), 11/09/03 at 0730 (blood sugar level of 55) and 1330 (blood sugar level of 331), 11/11/03 at 0720 (blood sugar level of 320) and 1355 (blood sugar level of 276), 11/12/03 at 1330 (blood sugar level of 329), 11/13/09 at 1220 (blood sugar level of 339), 11/14/03 at 1745 (blood sugar level at 58), 11/15/03 at 0800 (blood sugar level of 314), 11/18/03 at 1745 (blood sugar level of 362), 11/19/03 at 0730 (blood sugar level at 311), 11/20/03 at 1330 (blood sugar level at 306), 11/22/03 at 0730 (blood sugar level of 524), 11/23/03 at 0730 (blood sugar level of 481) and 1737 (blood sugar level of 327), 11/25/03 at 0730 (blood sugar level of 397), 11/26/03 at 1730 (blood sugar level of 508) and 1330 (blood sugar level of 391), 11/27/03 at 1320 (blood sugar level of 345) and 1320 (blood sugar level of 392), 11/29/03 at 0825 (blood sugar level of 420), 11/30/03 at 0715 (blood sugar level of 338).

[9] In fact, the constant fluctuation of blood sugar levels is extremely hard on a diabetic's body, and will eventually lead to irreversible organ damage. *See* ADOC Health Services Bureau HEP 1007-01/06.

NOTICE OF CLAIM PURSUANT TO A.R.S. § 12-821.01
Maricopa County Sheriff's Office
Maricopa County Correctional Health Services
Arizona Department of Corrections
January 20, 2009
Page 9

nonresponsive to the nurse who had been sent to check on him. *Id.* The nurse, knowing of Mr. Payne's chronic medical condition, informed the officers on duty that they should open Mr. Payne's cell and check on him. *Id.* For no reason, the officers refused, and instead required the nurse to record that Mr. Payne had refused his "Accucheck" and refused to attend his court hearing that morning. *Id.* In reality, however, Mr. Payne was suffering from severe diabetes-related complications due to the inadequate treatment and care he had been receiving from Maricopa (which Mr. Payne only now understands caused, along with the totality of his mistreatment while under Maricopa's and ADOC's supervision, his current mental and physical condition). In fact, upon further internal investigation, Maricopa's own findings confirm Mr. Payne's account of what transpired:

> Per Ofc Schwartz on shift I-Ofc Birchfield A6867 was the house officer (one man house) on shift III when the incident supposedly happened. Ofc Schwartz stated that nurse Eugenia as well as other inmates were stating that the officer refused to check on inmate Payne as directed by medical staff. Ofc. Schwartz stated that shift I found inmate Payne 'unresponsive' during morning chow at approximately 8:05 a.m.

Typewritten Investigation Notes dated 5/25/04, 1400. Despite this, Maricopa took no action, and as a result, Mr. Payne filed an institutional appeal. *See* Inmate Institutional Appeal Form dated 5/27/04, #5009. Maricopa's response to Mr. Payne's institutional appeal—given Maricopa's apparent reluctance to remedy the situation—was astounding, with the Jail Commander admitting that Mr. Payne "often 'crash[es]' due to low blood sugar causing [Mr. Payne] to be in an incoherent/confused state" and that on the date of the incident in question Mr. Payne was in just such an "incoherent/confused state." *Id.* Yet, despite that acknowledgement and admission, that same Jail Commander found that Mr. Payne had somehow "denied [his] Accucheck without realizing [his] condition." *Id.*

Dissatisfied with what was clearly a shallow resolution, Mr. Payne filed an external grievance. *See* Inmate External Grievance Appeal Form dated 6/2/04, #5009. Mr. Payne's external grievance, however, was met with life-threatening hostility. Early one morning Mr. Payne was found unconscious in his cell after having lapsed into another diabetes-induced state of unconsciousness as the result of yet another hypoglycemic episode attributable to Maricopa's deficient medical care. That same morning, after Mr. Payne had finally received some form of medical attention, six officers arrived at his cell. The officers extracted Mr. Payne from his cell, placed him in restraints, and transported him to a nearby day-room. In that day-room, the six officers surrounded him. Then, one officer explained that, had they not found Mr. Payne lying

NOTICE OF CLAIM PURSUANT TO A.R.S. § 12-821.01
Maricopa County Sheriff's Office
Maricopa County Correctional Health Services
Arizona Department of Corrections
January 20, 2009
Page 10

unconscious in his cell earlier that morning, and had they not transported him to the infirmary for medical treatment, he would have died.   The officer then explained that if Mr. Payne's grievances against them were not withdrawn, perhaps next time the officers would not arrive in time to save Mr. Payne's life.   After this chilling confrontation, Mr. Payne was returned to his cell.

Now, after having been released from his incarceration and having had the opportunity to obtain sufficient medical care, Mr. Payne learned in late 2008, for the first time ever, that the aforementioned occurrences resulted in his current physical condition, cognitive decline, and his total and permanent disability and unemployability.

**B.     Mr. Payne's Post-Conviction Custody With ADOC**

Mr. Payne's tenure with ADOC in its Florence, Arizona facility was likewise riddled with negligently administered, constitutionally deficient medical care that Mr. Payne now realizes resulted in his current physical condition, cognitive decline, and his total and permanent disability and unemployability.

**(i)     ADOC's Policy Regarding Diabetic Inmates**

The ADOC Department Order Manual defines diabetes as among those "chronic conditions requiring regular examinations and/or treatment."   Department Order 1101.[10]   ADOC policy mandates that "medications and treatments for inmates with chronic conditions" shall be ordered and made available to inmates "in a timely manner so that the inmates receive the necessary treatment for their chronic conditions without interruption or unnecessary delay."   Department Order 1101.06 at 1.1.4.

In addition, ADOC's Health Services Bureau acknowledges that the high blood sugar levels associated with diabetes can damage the "eyes, kidneys, nerves, or heart" and lead to "heart attack, stroke, numbness or pain in legs . . . and/or . . . gangrene."   ADOC Health Services Bureau HEP 1007-01/06.   ADOC also identifies "irritability" as a common side-effect of diabetes and notes that short-term complications associated with the disease include "hypoglycemia," "hyperglycemia," and "ketoacdidosis" (or diabetic coma).   *Id.*   ADOC notes that hypoglycemia is a dangerous side-effect of diabetes that "must be treated quickly . . . because untreated hypoglycemia can lead to unconsciousness."   *Id.*   Finally, ADOC

---

[10]    Diabetes   is   likewise   listed   as   a   "chronic   illness"   on   ADOC's   official   website.   *See*
http://azcorrections.gov/adc/divisions/health/information.asp (last accessed Jan. 16, 2009, 5:03 p.m.).

NOTICE OF CLAIM PURSUANT TO A.R.S. § 12-821.01
Maricopa County Sheriff's Office
Maricopa County Correctional Health Services
Arizona Department of Corrections
January 20, 2009
Page 11

acknowledges that "control of blood sugar levels can help prevent/delay long-term diabetic complications."

As will be explained in detail below, Mr. Payne routinely exhibited these symptoms. Yet, despite all of this, ADOC negligently failed to make a reasonably appropriate effort to assist Mr. Payne with managing his diabetes. When ADOC did provide medical care, however, the care provided was constitutionally deficient.

(ii)     **ADOC Did Not Provide Mr. Payne Proper Medical Treatment**

Shortly after arriving at ADOC's Florence facility, Mr. Payne was given his first physical exam pursuant to standard ADOC policy. At that exam, the examiner noted that Mr. Payne was *not* a diabetic (although Mr. Payne had been a diabetic for two decades at that time). *See* ADOC Medical History dated 05/09/02 (noting Mr. Payne is not a diabetic). Thus began Mr. Payne's long struggle with ADOC's negligent and deficient medial care.

As with his incarceration under Maricopa, while under ADOC's care and supervision, Mr. Payne had difficulty obtaining even basic, constitutionally adequate medical treatment for his disease. Requests for something as simple as glucose tablets—sugar tablets designed to enable a person with diabetes to control sudden blood sugar fluctuations—often went unmet due to lack of supply (contrary to ADOC's policy to provide medication for "inmates with chronic conditions in a timely manner so that the inmates receive the necessary treatment for their chronic conditions without interruption or unnecessary delay." Department Order 1101.06, § 1.1.4). And, when glucose tablets were provided, the dosage given was often insufficient to provide any health benefit. For example, if the blood sugar of a person with diabetes falls below 50, a minimum of six glucose tablets are needed. If the blood sugar of a person with diabetes falls between 50 and 70, a minimum of three glucose tablets are needed. Mr. Payne would often fall well within the 50 to 70 range. Regardless of the level of Mr. Payne's blood sugar at the time the tablets were provided, however, he usually only received two to three glucose tablets. In fact, at one point Mr. Payne and other prisoners with diabetes were told that because ADOC failed to pay for the glucose tablets, ADOC was on a C.O.D. basis with the company, and there would be no tablets to distribute.

ADOC is well aware that persons with diabetes must ingest a specially prepared "diabetic" diet so as to maintain a consistent carbohydrate-to-insulin ratio and avoid a hypoglycemic or hyperglycemic episode. ADOC even purports to provide persons with diabetes with a "diabetic meal card" entitling such persons to receive a special medical diet (*see* Department Order 912.06) so as to enable them to avoid a dangerous fluctuation in their blood sugar. Despite its

NOTICE OF CLAIM PURSUANT TO A.R.S. § 12-821.01
Maricopa County Sheriff's Office
Maricopa County Correctional Health Services
Arizona Department of Corrections
January 20, 2009
Page 12

medical necessity, Mr. Payne was initially denied (for no apparent reason) his "diabetic meal card." In fact, Mr. Payne actually had to file a grievance and did not receive a "diabetic meal card" until *after* a year of complaining and delay.[11] *See* ADOC Inmate Letter Q-F-13 from J. Payne to ADW Rivas dated 5/10/05 (Informing ADOC that "I am trying to informally resolve an ongoing problem with my Diabetic Diet and complications with my glucose levels resulting thereof," that "I have yet to get the Diet Card almost 11 months later," that I "have experienced unnecessary bouts with both low (Hypoglycemia) and high (Hyperglycemia) blood glucose levels," and that "although I am on the printed diet list I am informed that per your order I must also have a laminated diet card."); ADOC Inmate Letter Response from R. Cordova (for DW Rivas) to J. Payne, dated 5/11/05(stating, in full, "[y]our issue is being addressed with the Canteen Supervisor."). During the interim, however, because of unsafe blood sugar fluctuations, Mr. Payne often lapsed into episodes of intense anxiety, and eventually, unconsciousness.

In fact, while under ADOC's supervision, Mr. Payne's blood sugar level was rarely within medically acceptable ranges. *See* Lorber Letter at 1 (noting "wide swings between severe hypoglycemic levels causing . . . loss of consciousness and [glucose levels] more than five times normal."). Surprisingly, ADOC staff mistakenly believed that blood sugar levels between 70 and 350 were medically acceptable. *See* ADOC Long-Term/Continuous Medication and Treatment Record dated Sept. 2002 ("*Call HCP if BS >350 or <70 + symptomatic.").[12] And, when Mr. Payne's blood sugar stretched beyond those levels, treatment was still only warranted if Mr. Payne was "symptomatic" of having high or low blood sugar levels; a simple high or low test result was not enough. *Id.* Often times Mr. Payne would have a blood sugar level as low as 9

---

[11] During the period he waited for his "diabetic meal card," Mr. Payne was sporadically given extra food because some of the nurses who treated him knew of his condition, but such occurrences were the exception. And, even when he was given the food—which was to be taken to his cell and consumed in the evening when the risk of having a low blood sugar was great—if a guard found this food in Mr. Payne's cell it was often confiscated because, ironically, Mr. Payne did not have the required "diabetic meal card" enabling him to keep that food in his cell. *See* ADOC Inmate Letter Q-F-13 from J. Payne to ADW Rivas dated 5/10/05 (stating that medically necessary meals were not provided because "although [Mr. Payne was] on the printed diet list . . . per your order [Mr. Payne] must also have a laminated diet card" in order to receive his medically necessary meals). Again, this was done despite the common knowledge among those who supervised him that Mr. Payne was a diabetic. *See* Handwritten Note from "Jody LPN II" attaching ADOC Restricted Diet Order dated 7/22/04 and stating that "Payne is an insulin diabetic here is a copy of his **MEDICAL** diet. Kitchen lost his diet card. Please give him his diabetic diet.") (emphasis in original).

[12] Mr. Payne was told that a blood sugar level of 200 "was fine" and often not permitted any further medical treatment if he expressed any concern about having such a high blood sugar level. This appears to be consistent with ADOC's incomplete records, which indicate that medical treatment is only appropriate when a person with diabetes has a blood sugar level of over 350 *and* shows symptoms associated with elevated blood sugar. *See* ADOC Long-Term/Continuous Medication and Treatment Record dated Sept. 2002 ("*Call HCP if BS >350 or <70 + symptomatic.").

NOTICE OF CLAIM PURSUANT TO A.R.S. § 12-821.01
Maricopa County Sheriff's Office
Maricopa County Correctional Health Services
Arizona Department of Corrections
January 20, 2009
Page 13

and as high as over 400.[13]   In fact, on one occasion, Mr. Payne even had a blood sugar level of 900!   *See* ADOC Continuous Progress Record (S.O.A.P.) dated 05/30/02.  Mr. Payne now realizes that because he was made to endure these unhealthy fluctuations in his blood sugar levels, over time he suffered irreversible physiological, psychological and physical damage.

In addition, on one occasion Mr. Payne's laboratory test results revealed that he had a Hemoglobin Alc level of 9.2H%.  *See* Laboratory Corporation of America Test Results dated 5/17/02.  Acceptable ranges for Hemoglobin Alc levels are between 4.5%-5.7% and a range of <7% for a diabetic is considered optimal.  *See id.*  The significance of this information—which was provided to ADOC—is that such high Hemoglobin Alc levels posed a "[h]igh risk of developing long term complications such as retinopathy, nephropathy, neuropathy, cardiopathy . . . and [s]ome danger of hypoglycemic reaction in type I diabetics."  *Id.*  In other words, a hemoglobin Alc level of 9.2% "indicat[es] poor diabetes control."  Lorber Letter at 2.  Yet, ADOC apparently ignored this warning and continued its course of negligent, unconstitutional conduct.

Further, for persons with diabetes, a consistent insulin dosage and food intake regime is critical.  For example, persons with diabetes are supposed to eat within thirty minutes of receiving insulin to maintain an appropriate blood sugar level.  The timing of Mr. Payne's morning and evening insulin injection, however, were unpredictable, making adequate blood sugar control through regulated food-intake after an insulin injection next to impossible.  And, even when Mr. Payne was able to follow his insulin injection with food intake, the food-to-insulin ratio was usually insufficient.  Mr. Payne's meals oftentimes contained a carbohydrate content fluctuating between 100-150 carbohydrates, resulting in an unsafe elevation in his blood sugar and eventually causing numerous hypoglycemic episodes.[14]   *See* Progress Notes dated 07/04/04 at 2340 ("now they have

---

[13] *See* ADOC Long-Term/Continuous Medication and Treatment Records dated 5/14/02 (blood sugar levels at 46, 334, and 349); June 2002 (blood sugar levels on 6/3/02 as low as 57 and as high as 495; and as 6/6/02 as low as 38 and as high as 471; and on an undated June 2002 report as low as 6 and as high as 341); May/June 2002 (undated report noting blood sugar levels of as low as 46 and as high as 349); July 2002 (blood sugar levels on 7/30/02, as low as 48 and as high as 362); 7/20/02 (blood sugar level is at >300 and >400); 7/24/02 (blood sugar level is at 451); 7/30/02 (blood sugar is at >300 and >400); August 2002 (blood sugar levels of 74, 201, 241, and 283); Sept. 2002 (blood sugar levels of 80, 254).  Like Maricopa, ADOC's response to Mr. Payne's public records request for his incarceration records appears to have been woefully incomplete as no medical records for the years 2003-2007 were produced despite repeated public records requests.

[14] Hypoglycemic episodes often lead to seizures.  During one hypoglycemic episode while under ADOC's care, Mr. Payne suffered a seizure, causing him to collapse and seriously injure his shoulder—an injury that ADOC never treated, resulting in Mr. Payne's current, persistent daily pain and discomfort he can only attempt to remedy through surgery.

NOTICE OF CLAIM PURSUANT TO A.R.S. § 12-821.01
Maricopa County Sheriff's Office
Maricopa County Correctional Health Services
Arizona Department of Corrections
January 20, 2009
Page 14

cut down on my NPH again and adjusted my sliding scale so I don't get anything for less than 200 . . . I'm afraid to eat anything anymore.").

## III.    Damages

The American Diabetes Association ("ADA") has publicly stated that "diabetes management is dependent upon having access to needed medical personnel and equipment. Ongoing diabetes therapy is important in order to reduce the risk of later complications, including cardiovascular events, visual loss, renal failure, and amputation." *Diabetes Management in Correctional Institutions*, Diabetes Care, Vol. 31, Supp. 1, Jan. 2008. At least one independent, renowned medical expert, Dr. Daniel L. Lorber, M.D., F.A.C.P.—after reviewing even the incomplete records Maricopa and ADOC provided pursuant to Arizona's public records law—has concluded that "Mr. Payne's diabetes was inappropriately managed during his incarceration both in the Maricopa County System and in the Arizona State Department of Correction System." Lorber Letter at 2.  In short, the deficient medical care and treatment Mr. Payne received while incarcerated with Maricopa and ADOC caused him long-term, permanent damage.

"Not only did [Mr. Payne] have recurrent severe hypoglycemic episodes with resulting hypoglycemic unawareness, but also the dramatic swings in glucose with persistent hyperglycemia combined with the episodes of hypoglycemia is likely to have caused exacerbation of diabetic complications including neuropathy and cognitive dysfunction." *Id.* at 3.  Thus, it is clear that "the mismanagement of Mr. Payne's diabetes during his incarceration in Arizona resulted in medically significant long-term physical and emotional damage." *Id.* Specifically, "[d]uring his incarceration, Mr. Payne's diabetes regimen of twice daily NPH insulin with variable amounts of short-acting insulin was unsuccessful in achieving glucose control." *Id.* at 1.  And, Mr. Payne's "fingerstick glucose values were characterized by wide swings between severe hypoglycemic levels causing . . . loss of consciousness and [glucose levels] more than five times normal." *Id.* Maricopa's records (again, which appear incomplete) further reveal that Mr. Payne "often went for hours after a severe low sugar before it was retested." *Id* at 2.  ADOC's records (which likewise appear incomplete) reveal that Mr. Payne "had recurrent hypoglycemic episodes . . . ." *Id.* In fact, the "[t]wice daily NPH insulin" that Maricopa and ADOC provided to Mr. Payne during his incarceration, "particularly when it is given before breakfast and before supper . . . has not been the standard of care for diabetes for almost three decades." *Id.* "As a result of this inappropriate regimen, combined with the prolonged use of 'sliding scale' insulin treatment, Mr. Payne suffered both physical and emotional trauma." *Id.*

NOTICE OF CLAIM PURSUANT TO A.R.S. § 12-821.01
Maricopa County Sheriff's Office
Maricopa County Correctional Health Services
Arizona Department of Corrections
January 20, 2009
Page 15

Recently on August 5, 2008, Mr. Payne's current physician, Dr. Edward Collacott, determined that Mr. Payne is "totally and permanently disabled and unemployable." *Id.* Then on August 19, 2008, Mr. Payne's treating physician diagnosed Mr. Payne as having "severe hypoglycemia unawareness, severe hypoglycemia, and possible gastroparesis."[15] *Id.* at 2. Later, on September 25, 2008, Mr. Payne endured a neuropsychological evaluation by Dr. Kathryn Crema, in which it was concluded that he appears "to sustain some mild though significant verbal recall deficit secondary to visual uncontrolled diabetes." *Id.* In addition, Mr. Payne suffers from two types of nerve damage (known as "neuropathy"): peripheral and autonomic.[16]   The peripheral nerve damage causes Mr. Payne to suffer constant pain in his arms, legs and feet and contributes to an overall decline in Mr. Payne's motor skills because Mr. Payne's nerve endings are basically dead.  Mr. Payne also experiences lack of feeling on the left side of his face.  Because of the "death" of his nerve endings, Mr. Payne has no ability to determine when he has a laceration or wound near those dead nerve endings, which are generally unable to heal, often leading to gangrene or other infection.   Such infections frequently go unnoticed, and thus untreated, because they simply cannot be felt.  As a result of this unnoticed infection, amputation of the affected limb is eventually required.  The autonomic neuropathy, on the other hand, causes Mr. Payne to endure constant, daily nausea and digestive problems as well as extremely high blood pressure and hypertension. *See* Lorber Letter at 3 (noting August 19, 2008, diagnosis of possible gastroparesis).

Mr. Payne's inability to obtain the adequate medical supervision and treatment necessary to effectively manage his chronic disease while under the supervision and care of Maricopa and ADOC has caused the irreparable deterioration of Mr. Payne's physical and psychological condition, leaving him brittle and totally and permanently disabled and unemployable. *See id.* at 3.  Mr. Payne's treating physicians would agree that all of the foregoing has no doubt shaved years from Mr. Payne's life.

**IV.    Proposed Resolution**

At only 44 years of age, Mr. Payne has a lifetime of medical-related complications to endure, in excess of two million dollars of lost income, and he must cope daily with pain and suffering as a result of his present physical and psychological condition.

---

[15] As recently as September 3, 2008, Mr. Payne suffered a grand mal seizure due to his hypoglycemic unawareness. *See* Lorber Letter at 2.

[16] As early as December 18, 2007, doctors noted that Mr. Payne exhibited "slurred speech and word finding difficulties with mild dysarthria and possible dysphasia" as well as "mild-to-moderate sensory motor poly neuropathy [(nerve damage)] characterized primarily by axonal loss." Lorber Letter at 2.

NOTICE OF CLAIM PURSUANT TO A.R.S. § 12-821.01
Maricopa County Sheriff's Office
Maricopa County Correctional Health Services
Arizona Department of Corrections
January 20, 2009
Page 16

Based on the foregoing, as compensation for Mr. Payne's (i) lost wages due to his current condition of total and permanent disability and unemployablity[17]; and his (ii) future medical costs, pain, and suffering, Mr. Payne will accept the following as full and final settlement of his claims:

- $5,800,000.00; together with

- A written agreement from Maricopa and ADOC, acceptable to Mr. Payne, indicating that Maricopa and ADOC will (i) revise their written internal policies and procedures to require that all correctional institutions under their supervision or control will implement and abide by the ADA standards for Diabetes Management in Correctional Institutions; (ii) provide a timeline for the implementation of such standards; (iii) appoint a full-time employee to oversee the implementation of, and maintain, such standards; and (iv) agree to allow an ADA representative to monitor Maricopa's and ADOC's compliance with ADA standards.

For your convenience, copies of the records provided to us by ADOC and Maricopa are enclosed herewith on a compact disc, along with a copy of Dr. Daniel L. Lorber, M.D., F.A.C.P.'s letter January 7, 2009. We truly hope that you will elect to discuss the resolution of these issues with us and not require Mr. Payne to seek redress in court. If you have any questions or concerns about the matters discussed herein, or if you wish to discuss these matters generally, please do not hesitate to contact me directly.

Very truly yours,

Craig A. Morgan

CAM

Enclosures

---

[17] This lost wages calculation is based on Mr. Payne's pre-incarceration employment where he had base income of $84,500.00 (excluding annual performance bonuses, incentives, pension or other employer-made retirement contributions, and other benefits) and the assumption that Mr. Payne would have worked until age 65. This calculation further reflects adjustments for cost of living and a reduction to present value.

# Exhibit A

POSITION STATEMENT

# Diabetes Management in Correctional Institutions

AMERICAN DIABETES ASSOCIATION

At any given time, over 2 million people are incarcerated in prisons and jails in the U.S (1). It is estimated that nearly 80,000 of these inmates have diabetes, a prevalence of 4.8% (2). In addition, many more people pass through the corrections system in a given year. In 1998 alone, over 11 million people were released from prison to the community (1). The current estimated prevalence of diabetes in correctional institutions is somewhat lower than the overall U.S. prevalence of diabetes, perhaps because the incarcerated population is younger than the general population. The prevalence of diabetes and its related comorbidities and complications, however, will continue to increase in the prison population as current sentencing guidelines continue to increase the number of aging prisoners and the incidence of diabetes in young people continues to increase.

People with diabetes in correctional facilities should receive care that meets national standards. Correctional institutions have unique circumstances that need to be considered so that all standards of care may be achieved (3). Correctional institutions should have written policies and procedures for the management of diabetes and for training of medical and correctional staff in diabetes care practices. These policies must take into consideration issues such as security needs, transfer from one facility to another, and access to medical personnel and equipment, so that all appropriate levels of care are provided. Ideally, these policies should encourage or at least allow patients to self-manage their diabetes. Ultimately, diabetes management is dependent upon having access to needed medical personnel and equipment. Ongoing diabetes therapy is important in order to reduce the risk of later complications, including cardiovascular events, visual loss, renal failure, and amputation. Early

identification and intervention for people with diabetes is also likely to reduce short-term risks for acute complications requiring transfer out of the facility, thus improving security.

This document provides a general set of guidelines for diabetes care in correctional institutions. It is not designed to be a diabetes management manual. More detailed information on the management of diabetes and related disorders can be found in the American Diabetes Association (ADA) Clinical Practice Recommendations, published each year in January as the first supplement to *Diabetes Care*, as well as the "Standards of Medical Care in Diabetes" (4) contained therein. This discussion will focus on those areas where the care of people with diabetes in correctional facilities may differ, and specific recommendations are made at the end of each section.

## INTAKE MEDICAL ASSESSMENT

### Reception screening

Reception screening should emphasize patient safety. In particular, rapid identification of all insulin-treated persons with diabetes is essential in order to identify those at highest risk for hypo- and hyperglycemia and diabetic ketoacidosis (DKA). All insulin-treated patients should have a capillary blood glucose (CBG) determination within 1–2 h of arrival. Signs and symptoms of hypo- or hyperglycemia can often be confused with intoxication or withdrawal from drugs or alcohol. Individuals with diabetes exhibiting signs and symptoms consistent with hypoglycemia, particularly altered mental status, agitation, combativeness, and diaphoresis, should have finger-stick blood glucose levels measured immediately.

### Intake screening

Patients with a diagnosis of diabetes should have a complete medical history and physical examination by a licensed health care provider with prescriptive authority in a timely manner. If one is not available on site, one should be consulted by those performing reception screening. The purposes of this history and physical examination are to determine the type of diabetes, current therapy, alcohol use, and behavioral health issues, as well as to screen for the presence of diabetes-related complications. The evaluation should review the previous treatment and the past history of both glycemic control and diabetes complications. It is essential that medication and medical nutrition therapy (MNT) be continued without interruption upon entry into the correctional system, as a hiatus in either medication or appropriate nutrition may lead to either severe hypo- or hyperglycemia that can rapidly progress to irreversible complications, even death.

### Intake physical examination and laboratory

All potential elements of the initial medical evaluation are included in Table 5 of the ADA's "Standards of Medical Care in Diabetes," referred to hereafter as the "Standards of Care" (4). The essential components of the initial history and physical examination are detailed in Fig. 1. Referrals should be made immediately if the patient with diabetes is pregnant.

### Recommendations

- Patients with a diagnosis of diabetes should have a complete medical history and undergo an intake physical examination by a licensed health professional in a timely manner. (E)
- Insulin-treated patients should have a CBG determination within 1–2 h of arrival. (E)
- Medications and MNT should be continued without interruption upon entry into the correctional environment. (E)

## SCREENING FOR DIABETES —

Consistent with the ADA Standards of Care, patients should be evaluated for diabetes risk factors at the intake physical and at appropriate times thereafter. Those

Originally approved 1989. Most recent review, 2007.

Abbreviations: CBG, capillary blood glucose; DKA, diabetic ketoacidosis; GDM, gestational diabetes mellitus; MNT, medical nutrition therapy.

DOI: 10.2337/dc08-S087

© 2008 by the American Diabetes Association.

ADA00001

*Correctional Institutions*

Within 1-2 hrs.



•**Identify all inmates with diabetes currently using insulin therapy or at high risk for hypoglycemia**
• **ALL insulin treated patients: screening CBG and urine ketone test (as clinically indicated)**
• **Any patient exhibiting signs/symptoms consistent with hypoglycemia: immediate CBG**
•**Continue usual meal schedule and medication administration**

Within 2-24 hrs.



•**Type and duration of diabetes**　　　　　•Assess alcohol use
•**Confirm current therapy**　　　　　　　•Identify behavioral health issues
•**Presence of complications**　　　　　　　such as depression, distress, suicidal ideation
•**Family history**　　　　　　　　　　　•Assess prior diabetes educa
•**Pregnancy screen in all female patients**
of childbearing age with diabetes

*All subjects with diabetes should have physician evaluation. If no physician available, physician should be consulted.*

Within 2 hrs. – 2 weeks



**Complete exam including:**　　　　　**Laboratory studies:**
•**Height, weight**　　　　　　　　　•A1C and glucose
•**Blood pressure**　　　　　　　　　•Lipid Profile
•**Eye (retinal) exam**　　　　　　　•Microalbumin screen (Alb/Cr ratio)
•**Cardiac**　　　　　　　　　　　　•Urine ketones (as clinically indicated)
•**Peripheral pulses**　　　　　　　　•AST/ALT (as clinically indicated)
•**Foot and neurologic exam**　　　　•Creatinine (as clinically indicated)

**Figure 1**—*Essential components of the initial history and physical examination. Alb/Cr ratio, albumin-to-creatinine ratio; ALT, alanine aminotransferase; AST, aspartate aminotransferase.*

who are at high risk should be considered for blood glucose screening. If pregnant, a risk assessment for gestational diabetes mellitus (GDM) should be undertaken at the first prenatal visit. Patients with clinical characteristics consistent with a high risk for GDM should undergo glucose testing as soon as possible. High-risk women not found to have GDM at the initial screening and average-risk women should be tested between 24 and 28 weeks of gestation. For more detailed information on screening for both type 2 and gestational diabetes, see the ADA Position Statement "Screening for Type 2 Diabetes" (5) and the Standards of Care (4).

**MANAGEMENT PLAN** — Glycemic control is fundamental to the management of diabetes. A management plan to achieve normal or near-normal glycemia with an A1C goal of <7% should be developed for diabetes management at the time of initial medical evaluation. Goals should be individualized (4), and less stringent treatment goals may be appropriate for patients with a history of severe hypoglycemia, patients with limited life expectancies, elderly adults, and indi-

viduals with comorbid conditions (4). This plan should be documented in the patient's record and communicated to all persons involved in his/her care, including security staff. Table 1, taken from the ADA Standards of Care, provides a summary of recommendations for setting glycemic control goals for adults with diabetes.

People with diabetes should ideally receive medical care from a physician-coordinated team. Such teams include, but are not limited to, physicians, nurses, dietitians, and mental health professionals with expertise and a special interest in diabetes. It is essential in this collaborative and integrated team approach that individuals with diabetes assume as active a role in their care as possible. Diabetes self-management education is an integral component of care. Patient self-management should be emphasized, and the plan should encourage the involvement of the patient in problem solving as much as possible.

It is helpful to house insulin-treated patients in a common unit, if this is possible, safe, and consistent with providing access to other programs at the correc-

tional institution. Common housing not only can facilitate mealtimes and medication administration, but also potentially provides an opportunity for diabetes self-management education to be reinforced by fellow patients.

**NUTRITION AND FOOD SERVICES** — Nutrition counseling and menu planning are an integral part of the multidisciplinary approach to diabetes management in correctional facilities. A combination of education, interdisciplinary communication, and monitoring food intake aids patients in understanding their medical nutritional needs and can facilitate diabetes control during and after incarceration.

Nutrition counseling for patients with diabetes is considered an essential component of diabetes self-management. People with diabetes should receive individualized MNT as needed to achieve treatment goals, preferably provided by a registered dietitian familiar with the components of MNT for persons with diabetes.

Educating the patient, individually or in a group setting, about how carbohydrates and food choices directly affect di-

ADA00002

Table 1—*Summary of recommendations for glycemic, blood pressure, and lipid control for adults with diabetes*

| | |
|---|---|
| A1C | <7.0%* |
| Blood pressure | <130/80 mmHg |
| Lipids | |
|     LDL cholesterol | <100 mg/dl (<2.6 mmol/l) |

*Referenced to a nondiabetic range of 4.0–6.0% using a DCCT-based assay. †In individuals with overt CVD, a lower LDL cholesterol goal of <70 mg/dl (1.8 mmol/l), using a high dose of a statin, is an option.

abetes control is the first step in facilitating self-management. This education enables the patient to identify better food selections from those available in the dining hall and commissary. Such an approach is more realistic in a facility where the patient has the opportunity to make food choices.

The easiest and most cost-effective means to facilitate good outcomes in patients with diabetes is instituting a heart-healthy diet as the master menu (6). There should be consistent carbohydrate content at each meal, as well as a means to identify the carbohydrate content of each food selection. Providing carbohydrate content of food selections and/or providing education in assessing carbohydrate content enables patients to meet the requirements of their individual MNT goals. Commissaries should also help in dietary management by offering healthy choices and listing the carbohydrate content of foods.

The use of insulin or oral medications may necessitate snacks in order to avoid hypoglycemia. These snacks are a part of such patients' medical treatment plans and should be prescribed by medical staff.

Timing of meals and snacks must be coordinated with medication administration as needed to minimize the risk of hypoglycemia, as discussed more fully in the MEDICATION section of this document. For further information, see the ADA Position Statement "Nutrition Principles and Recommendations in Diabetes" (7).

**URGENT AND EMERGENCY ISSUES** — All patients must have access to prompt treatment of hypo- and hyperglycemia. Correctional staff should be trained in the recognition and treatment of hypo- and hyperglycemia, and appropriate staff should be trained to administer glucagon. After such emergency care, patients should be referred for appropriate medical care to minimize risk of future decompensation.

Institutions should implement a policy requiring staff to notify a physician of all CBG results outside of a specified range, as determined by the treating physician (e.g., <50 or >350 mg/dl).

**Hyperglycemia**
Severe hyperglycemia in a person with diabetes may be the result of intercurrent illness, missed or inadequate medication, or corticosteroid therapy. Correctional institutions should have systems in place to identify and refer to medical staff all patients with consistently elevated blood glucose as well as intercurrent illness.

The stress of illness in those with type 1 diabetes frequently aggravates glycemic control and necessitates more frequent monitoring of blood glucose (e.g., every 4–6 h). Marked hyperglycemia requires temporary adjustment of the treatment program and, if accompanied by ketosis, interaction with the diabetes care team. Adequate fluid and caloric intake must be ensured. Nausea or vomiting accompanied with hyperglycemia may indicate DKA, a life-threatening condition that requires immediate medical care to prevent complications and death. Correctional institutions should identify patients with type 1 diabetes who are at risk for DKA, particularly those with a prior history of frequent episodes of DKA. For further information see "Hyperglycemic Crisis in Diabetes" (8).

**Hypoglycemia**
Hypoglycemia is defined as a blood glucose level <60 mg/dl. Severe hypoglycemia is a medical emergency defined as hypoglycemia requiring assistance of a third party and is often associated with mental status changes that may include confusion, incoherence, combativeness, somnolence, lethargy, seizures, or coma. Signs and symptoms of severe hypoglycemia can be confused with intoxication or withdrawal. Individuals with diabetes exhibiting signs and symptoms consistent with hypoglycemia, particularly altered mental status, agitation, and diaphoresis, should have their CBG levels checked immediately.

Security staff who supervise patients at risk for hypoglycemia (i.e., those on insulin or oral hypoglycemic agents) should be educated in the emergency response protocol for recognition and treatment of hypoglycemia. Every attempt should be made to document CBG before treatment. Patients must have immediate access to glucose tablets or other glucose-containing foods. Hypoglycemia can generally be treated by the patient with oral carbohydrates. If the patient cannot be relied on to keep hypoglycemia treatment on his/her person, staff members should have ready access to glucose tablets or equivalent. In general, 15–20 g oral glucose will be adequate to treat hypoglycemic events. CBG and treatment should be repeated at 15-min intervals until blood glucose levels return to normal (>70 mg/dl).

Staff should have glucagon for intramuscular injection or glucose for intravenous infusion available to treat severe hypoglycemia without requiring transport of the hypoglycemic patient to an outside facility. Any episode of severe hypoglycemia or recurrent episodes of mild to moderate hypoglycemia require reevaluation of the diabetes management plan by the medical staff. In certain cases of unexplained or recurrent severe hypoglycemia, it may be appropriate to admit the patient to the medical unit for observation and stabilization of diabetes management.

Correctional institutions should have systems in place to identify the patients at greater risk for hypoglycemia (i.e., those on insulin or sulfonylurea therapy) and to ensure the early detection and treatment of hypoglycemia. If possible, patients at greater risk of severe hypoglycemia (e.g., those with a prior episode of severe hypoglycemia) may be housed in units closer to the medical unit in order to minimize delay in treatment.

**Recommendations**
- Train correctional staff in the recognition, treatment, and appropriate referral for hypo- and hyperglycemia. (E)
- Train appropriate staff to administer glucagon. (E)
- Train staff to recognize symptoms and signs of serious metabolic decompensation, and immediately refer the patient for appropriate medical care. (E)
- Institutions should implement a policy requiring staff to notify a physician of all CBG results outside of a specified range, as determined by the treating physician (e.g., <50 or >350 mg/dl). (E)
- Identify patients with type 1 diabetes who are at high risk for DKA. (E)

ADA00003

*Correctional Institutions*

**MEDICATION** — Formularies should provide access to usual and customary oral medications and insulins necessary to treat diabetes and related conditions. While not every brand name of insulin and oral medication needs to be available, individual patient care requires access to short-, medium-, and long-acting insulins and the various classes of oral medications (e.g., insulin secretagogues, biguanides, $\alpha$-glucosidase inhibitors, and thiazolidinediones) necessary for current diabetes management.

Patients at all levels of custody should have access to medication at dosing frequencies that are consistent with their treatment plan and medical direction. If feasible and consistent with security concerns, patients on multiple doses of short-acting oral medications should be placed in a "keep on person" program. In other situations, patients should be permitted to self-inject insulin when consistent with security needs. Medical department nurses should determine whether patients have the necessary skill and responsible behavior to be allowed self-administration and the degree of supervision necessary. When needed, this skill should be a part of patient education. Reasonable syringe control systems should be established.

In the past, the recommendation that regular insulin be injected 30–45 min before meals presented a significant problem when "lock downs" or other disruptions to the normal schedule of meals and medications occurred. The use of multiple-dose insulin regimens using rapid-acting analogs can decrease the disruption caused by such changes in schedule. Correctional institutions should have systems in place to ensure that rapid-acting insulin analogs and oral agents are given immediately before meals if this is part of the patient's medical plan. It should be noted however that even modest delays in meal consumption with these agents can be associated with hypoglycemia. If consistent access to food within 10 min cannot be ensured, rapid-acting insulin analogs and oral agents are approved for administration during or immediately after meals. Should circumstances arise that delay patient access to regular meals following medication administration, policies and procedures must be implemented to ensure the patient receives appropriate nutrition to prevent hypoglycemia.

Both continuous subcutaneous insulin infusion and multiple daily insulin injection therapy (consisting of three or more injections a day) can be effective means of implementing intensive diabetes management with the goal of achieving near-normal levels of blood glucose (9). While the use of these modalities may be difficult in correctional institutions, every effort should be made to continue multiple daily insulin injection or continuous subcutaneous insulin infusion in people who were using this therapy before incarceration or to institute these therapies as indicated in order to achieve blood glucose targets.

It is essential that transport of patients from jails or prisons to off-site appointments, such as medical visits or court appearances, does not cause significant disruption in medication or meal timing. Correctional institutions and police lockups should implement policies and procedures to diminish the risk of hypo- and hyperglycemia by, for example, providing carry-along meals and medication for patients traveling to off-site appointments or changing the insulin regimen for that day. The availability of prefilled insulin "pens" provides an alternative for off-site insulin delivery.

**Recommendations**
- Formularies should provide access to usual and customary oral medications and insulins to treat diabetes and related conditions. (E)
- Patients should have access to medication at dosing frequencies that are consistent with their treatment plan and medical direction. (E)
- Correctional institutions and police lock-ups should implement policies and procedures to diminish the risk of hypo- and hyperglycemia during off-site travel (e.g., court appearances). (E)

**ROUTINE SCREENING FOR AND MANAGEMENT OF DIABETES COMPLICATIONS** — All patients with a diagnosis of diabetes should receive routine screening for diabetes-related complications, as detailed in the ADA Standards of Care (4). Interval chronic disease clinics to monitor patients with diabetes provide an efficient mechanism to monitor patients for complications of diabetes. In this way, appropriate referrals to consultant specialists, such as optometrists/ophthalmologists, nephrologists, and cardiologists, can be made on an as-needed basis and interval laboratory testing can be done.

The following complications should be considered.

- Foot care: Recommendations for foot care for patients with diabetes and no history of an open foot lesion are described in the ADA Standards of Care. A comprehensive foot examination is recommended annually for all patients with diabetes to identify risk factors predictive of ulcers and amputations. Persons with an insensate foot, an open foot lesion, or a history of such a lesion should be referred for evaluation by an appropriate licensed health professional (e.g., podiatrist or vascular surgeon). Special shoes should be provided as recommended by licensed health professionals to aid healing of foot lesions and to prevent development of new lesions.
- Retinopathy: Annual retinal examinations by a licensed eye care professional should be performed for all patients with diabetes, as recommended in the ADA Standards of Care. Visual changes that cannot be accounted for by acute changes in glycemic control require prompt evaluation by an eye care professional.
- Nephropathy: An annual spot urine test for determination of microalbumin-to-creatinine ratio should be performed. The use of ACE inhibitors or angiotensin receptor blockers is recommended for all patients with albuminuria. Blood pressure should be controlled to <130/80 mmHg.
- Cardiac: People with type 2 diabetes are at a particularly high risk of coronary artery disease. Cardiovascular disease risk factor management is of demonstrated benefit in reducing this complication in patients with diabetes. Blood pressure should be measured at every routine diabetes visit. In adult patients, test for lipid disorders at least annually and as needed to achieve goals with treatment. Use aspirin therapy (75–162 mg/day) in all adult patients with diabetes and cardiovascular risk factors or known macrovascular disease. Current national standards for adults with diabetes call for treatment of lipids to goals of LDL ≤100, HDL >40, triglycerides <150 mg/dl and blood pressure to a level of <130/80 mmHg.

**MONITORING/TESTS OF GLYCEMIA** — Monitoring of CBG is a strategy that allows caregivers and peo-

ADA00004

ple with diabetes to evaluate diabetes management regimens. The frequency of monitoring will vary by patients' glycemic control and diabetes regimens. Patients with type 1 diabetes are at risk for hypoglycemia and should have their CBG monitored three or more times daily. Patients with type 2 diabetes on insulin need to monitor at least once daily and more frequently based on their medical plan. Patients treated with oral agents should have CBG monitored with sufficient frequency to facilitate the goals of glycemic control, assuming that there is a program for medical review of these data on an ongoing basis to drive changes in medications. Patients whose diabetes is poorly controlled or whose therapy is changing should have more frequent monitoring. Unexplained hyperglycemia in a patient with type 1 diabetes may suggest impending DKA, and monitoring of ketones should therefore be performed.

Glycated hemoglobin (A1C) is a measure of long-term (2- to 3-month) glycemic control. Perform the A1C test at least two times a year in patients who are meeting treatment goals (and who have stable glycemic control) and quarterly in patients whose therapy has changed or who are not meeting glycemic goals.

Discrepancies between CBG monitoring results and A1C may indicate a hemoglobinopathy, hemolysis, or need for evaluation of CBG monitoring technique and equipment or initiation of more frequent CBG monitoring to identify when glycemic excursions are occurring and which facet of the diabetes regimen is changing.

In the correctional setting, policies and procedures need to be developed and implemented regarding CBG monitoring that address the following.

- Infection control
- Education of staff and patients
- Proper choice of meter
- Disposal of testing lancets
- Quality control programs
- Access to health services
- Size of the blood sample
- Patient performance skills
- Documentation and interpretation of test results
- Availability of test results for the health care provider (10)

**Recommendations**

- In the correctional setting, policies and procedures need to be developed and implemented to enable CBG monitor-

ing to occur at the frequency necessitated by the individual patient's glycemic control and diabetes regimen (E)

- A1C should be checked every 3–6 months. (E)

## SELF-MANAGEMENT
## EDUCATION — Self-management
education is the cornerstone of treatment for all people with diabetes. The health staff must advocate for patients to participate in self-management as much as possible. Individuals with diabetes who learn self-management skills and make lifestyle changes can more effectively manage their diabetes and avoid or delay complications associated with diabetes. In the development of a diabetes self-management education program in the correctional environment, the unique circumstances of the patient should be considered while still providing, to the greatest extent possible, the elements of the "National Standards for Diabetes Self-Management Education" (11). A staged approach may be used depending on the needs assessment and the length of incarceration. Table 2 sets out the major components of diabetes self-management education. Survival skills should be addressed as soon as possible; other aspects of education may be provided as part of an ongoing education program.

Ideally, self-management education is coordinated by a certified diabetes educator who works with the facility to develop polices, procedures, and protocols to ensure that nationally recognized education guidelines are implemented. The educator is also able to identify patients who need diabetes self-management education, including an assessment of the patients' medical, social, and diabetes histories; diabetes knowledge, skills, and behaviors; and readiness to change.

## STAFF EDUCATION — Policies and
procedures should be implemented to ensure that the health care staff has adequate knowledge and skills to direct the management and education of persons with diabetes. The health care staff needs to be involved in the development of the correctional officers' training program. The staff education program should be at a lay level. Training should be offered at least biannually, and the curriculum should cover the following.

- What is diabetes
- Signs and symptoms of diabetes
- Risk factors
- Signs and symptoms of, and emergency response to, hypo- and hyperglycemia
- Glucose monitoring
- Medications
- Exercise
- Nutrition issues including timing of meals and access to snacks

**Recommendations**

- Include diabetes in correctional staff education programs. (E)

## ALCOHOL AND DRUGS — Pa-
tients with diabetes who are withdrawing from drugs and alcohol need special consideration. This issue particularly affects initial police custody and jails. At an intake facility, proper initial identification and assessment of these patients are critical. The presence of diabetes may complicate detoxification. Patients in need of complicated detoxification should be referred to a facility equipped to deal with high-risk detoxification. Patients with diabetes should be educated to the risks involved with smoking. All inmates should be advised not to smoke. Assistance in smoking cessation should be provided as practical.

## TRANSFER AND
## DISCHARGE — Patients in jails may
be housed for a short period of time before being transferred or released, and it is not unusual for patients in prison to be transferred within the system several times during their incarceration. One of the many challenges that health care providers face working in the correctional system is how to best collect and communicate important health care information in a timely manner when a patient is in initial police custody, is jailed short term, or is transferred from facility to facility. The importance of this communication becomes critical when the patient has a chronic illness such as diabetes.

Transferring a patient with diabetes from one correctional facility to another requires a coordinated effort. To facilitate a thorough review of medical information and completion of a transfer summary, it is critical for custody personnel to provide medical staff with sufficient notice before movement of the patient.

Before the transfer, the health care staff should review the patient's medical record and complete a medical transfer

ADA00005

*Correctional Institutions*

**Table 2—Major components of diabetes self-management education**

| Survival skills | Daily management issues |
|---|---|
| • Hypo-/hyperglycemia | • Disease process |
| • Sick day management | • Nutritional management |
| • Medication | • Physical activity |
| • Monitoring | • Medications |
| • Foot care | • Monitoring |
| | • Acute complications |
| | • Risk reduction |
| | • Goal setting/problem solving |
| | • Psychosocial adjustment |
| | • Preconception care/pregnancy/gestational diabetes management |

summary that includes the patient's current health care issues. At a minimum, the summary should include the following.

- The patient's current medication schedule and dosages
- The date and time of the last medication administration
- Any recent monitoring results (e.g., CBG and A1C)
- Other factors that indicate a need for immediate treatment or management at the receiving facility (e.g., recent episodes of hypoglycemia, history of severe hypoglycemia or frequent DKA, concurrent illnesses, presence of diabetes complications)
- Information on scheduled treatment/ appointments if the receiving facility is responsible for transporting the patient to that appointment
- Name and telephone/fax number of a contact person at the transferring facility who can provide additional information, if needed

The medical transfer summary, which acts as a quick medical reference for the receiving facility, should be transferred along with the patient. To supplement the flow of information and to increase the probability that medications are correctly identified at the receiving institution, sending institutions are encouraged to provide each patient with a medication card to be carried by the patient that contains information concerning diagnoses, medication names, dosages, and frequency. Diabetes supplies, including diabetes medication, should accompany the patient.

The sending facility must be mindful of the transfer time in order to provide the patient with medication and food if needed. The transfer summary or medical record should be reviewed by a health

care provider upon arrival at the receiving institution.

Planning for patients' discharge from prisons should include instruction in the long-term complications of diabetes, the necessary lifestyle changes and examinations required to prevent these complications, and, if possible, where patients may obtain regular follow-up medical care. A quarterly meeting to educate patients with upcoming discharges about community resources can be valuable. Inviting community agencies to speak at these meetings and/or provide written materials can help strengthen the community link for patients discharging from correctional facilities.

Discharge planning for the patients with diabetes should begin 1 month before discharge. During this time, application for appropriate entitlements should be initiated. Any gaps in the patient's knowledge of diabetes care need to be identified and addressed. It is helpful if the patient is given a directory or list of community resources and if an appointment for follow-up care with a community provider is made. A supply of medication adequate to last until the first postrelease medical appointment should be provided to the patient upon release. The patient should be provided with a written summary of his/her current health care issues, including medications and doses, recent A1C values, etc.

**Recommendations**

- For all interinstitutional transfers, complete a medical transfer summary to be transferred with the patient. (E)
- Diabetes supplies and medication should accompany the patient during transfer. (E)
- Begin discharge planning with adequate lead time to insure continuity of

care and facilitate entry into community diabetes care. (E)

## SHARING OF MEDICAL INFORMATION AND

**RECORDS** — Practical considerations may prohibit obtaining medical records from providers who treated the patient before arrest. Intake facilities should implement policies that 1) define the circumstances under which prior medical records are obtained (e.g., for patients who have an extensive history of treatment for complications); 2) identify person(s) responsible for contacting the prior provider; and 3) establish procedures for tracking requests.

Facilities that use outside medical providers should implement policies and procedures for ensuring that key information (e.g., test results, diagnoses, physicians' orders, appointment dates) is received from the provider and incorporated into the patient's medical chart after each outside appointment. The procedure should include, at a minimum, a means to highlight when key information has not been received and designation of a person responsible for contacting the outside provider for this information.

All medical charts should contain CBG test results in a specified, readily accessible section and should be reviewed on a regular basis.

## CHILDREN AND ADOLESCENTS WITH

**DIABETES** — Children and adolescents with diabetes present special problems in disease management, even outside the setting of a correctional institution. Children and adolescents with diabetes should have initial and follow-up care with physicians who are experienced in their care. Confinement increases the difficulty in managing diabetes in children and adolescents, as it does in adults with diabetes. Correctional authorities also have different legal obligations for children and adolescents.

### Nutrition and activity

Growing children and adolescents have greater caloric/nutritional needs than adults. The provision of an adequate amount of calories and nutrients for adolescents is critical to maintaining good nutritional status. Physical activity should be provided at the same time each day. If increased physical activity occurs, addi-

ADA00006

tional CBG monitoring is necessary and additional carbohydrate snacks may be required.

**Medical management and follow-up**
Children and adolescents who are incarcerated for extended periods should have follow-up visits at least every 3 months with individuals who are experienced in the care of children and adolescents with diabetes. Thyroid function tests and fasting lipid and microalbumin measurements should be performed according to recognized standards for children and adolescents (12) in order to monitor for autoimmune thyroid disease and complications and comorbidities of diabetes.

Children and adolescents with diabetes exhibiting unusual behavior should have their CBG checked at that time. Because children and adolescents are reported to have higher rates of nocturnal hypoglycemia (13), consideration should be given regarding the use of episodic overnight blood glucose monitoring in these patients. In particular, this should be considered in children and adolescents who have recently had their overnight insulin dose changed.

**PREGNANCY** — Pregnancy in a woman with diabetes is by definition a high-risk pregnancy. Every effort should be made to ensure that treatment of the pregnant woman with diabetes meets accepted standards (14,15). It should be noted that glycemic standards are more stringent, the details of dietary management are more complex and exacting, insulin is the only antidiabetic agent approved for use in pregnancy, and a number of medications used in the management of diabetic comorbidities are known to be teratogenic and must be discontinued in the setting of pregnancy.

**SUMMARY AND KEY POINTS** — People with diabetes should receive care that meets national standards. Being incarcerated does not

change these standards. Patients must have access to medication and nutrition needed to manage their disease. In patients who do not meet treatment targets, medical and behavioral plans should be adjusted by health care professionals in collaboration with the prison staff. It is critical for correctional institutions to identify particularly high-risk patients in need of more intensive evaluation and therapy, including pregnant women, patients with advanced complications, a history of repeated severe hypoglycemia, or recurrent DKA.

A comprehensive, multidisciplinary approach to the care of people with diabetes can be an effective mechanism to improve overall health and delay or prevent the acute and chronic complications of this disease.

*Acknowledgments*— The following members of the American Diabetes Association/National Commission on Correctional Health Care Joint Working Group on Diabetes Guidelines for Correctional Institutions contributed to the revision of this document: Daniel L. Lorber, MD, FACP, CDE (chair); R. Scott Chavez, MPA, PA-C; Joanne Dorman, RN, CDE, CCHP-A; Lynda K. Fisher, MD; Stephanie Guerken, RD, CDE; Linda B. Haas, CDE, RN; Joan V. Hill, CDE, RD; David Kendall, MD; Michael Puisis, DO; Kathy Salomone, CDE, MSW, APRN; Ronald M Shansky, MD, MPH; and Barbara Wakeen, RD, LD.

**References**
1. National Commission on Correctional Health Care: *The Health Status of Soon-to-Be Released Inmates: A Report in Congress.* Vol. 1. Chicago, NCCHC, 2002
2. Hornung CA, Greifinger RB, Gadre S: *A Projection Model of the Prevalence of Selected Chronic Diseases in the Inmate Population.* Vol. 2. Chicago, NCCHC, 2002, p. 39–56
3. Puisis M: Challenges of improving quality in the correctional setting. In *Clinical Practice in Correctional Medicine.* St. Louis, MO, Mosby-Yearbook, 1998, p. 16–18
4. American Diabetes Association: Standards of medical care in diabetes—2008

(Position Statement). *Diabetes Care* 31 (Suppl. 1):S12–S54, 2008
5. American Diabetes Association: Screening for type 2 diabetes (Position Statement) *Diabetes Care* 27 (Suppl. 1):S11–S14, 2004
6. Krauss RM, Eckel RH, Howard B, Appel LJ, Daniels SR, Deckelbaum RJ, Erdman JW Jr, Kris-Etherton P, Goldberg IJ, Kotchen TA, Lichtenstein AH, Mitch WE, Mullis R, Robinson K, Wylie-Rosett J, St Jeor S, Suttie J, Tribble DL, Bazzarre TL: American Heart Association Dietary Guidelines: revision 2000: a statement for healthcare professionals from the Nutrition Committee of the American Heart Association. *Stroke* 31:2751–2766, 2000
7. American Diabetes Association: Nutrition recommendations and interventions for diabetes (Position Statement). *Diabetes Care* 31 (Suppl. 1):S61–S78, 2008
8. American Diabetes Association: Hyperglycemic crisis in diabetes (Position Statement). *Diabetes Care* 27 (Suppl. 1):S94–S102, 2004
9. American Diabetes Association: Continuous subcutaneous insulin infusion (Position Statement). *Diabetes Care* 27 (Suppl. 1):S110, 2004
10. American Diabetes Association: Tests of glycemia in diabetes (Position Statement). *Diabetes Care* 27 (Suppl. 1):S91–S93, 2004
11. American Diabetes Association: National standards for diabetes self-management education (Standards and Review Criteria). *Diabetes Care* 31 (Suppl. 1):S97–S104, 2008
12. International Society for Pediatric and Adolescent Diabetes: Consensus Guidelines 2000: ISPAD Consensus Guidelines for the Management of Type 1 Diabetes Mellitus in Children and Adolescents. Zeist, Netherlands, Medical Forum International, 2000, p. 116, 118
13. Kaufman FR, Austin J, Neinsein A, Jeng L, Halyorson M, Devoe DJ, Pitukcheewanont P: Nocturnal hypoglycemia detected with the continuous glucose monitoring system in pediatric patients with type 1 diabetes. *J Pediatr* 141:625–630, 2002
14. American Diabetes Association: Gestational diabetes mellitus (Position Statement). *Diabetes Care* 27 (Suppl. 1):S88–S90, 2004
15. *Jovanovic L (Ed.): Medical Management of Pregnancy Complicated by Diabetes.* 3rd ed. Alexandria, VA, American Diabetes Association, 2000

ADA00007